Case number 25-5209. Mennonite Church USA et al. impellants v. United States Department of Homeland Security et al. Ms. Corcoran for the appellants, Mr. Tao for the appellants. Good morning. Good morning, your honors. May it please the court, I'd like to reserve 3 minutes for rebuttal. My name is Kelsey Corcoran. I'm here on behalf of the plaintiff appellants, 27 Jewish and Christian rooted denominational bodies and associations who assert First Amendment, RFRA, and APA challenges to the defendants' change in immigration enforcement policy places of worship. As the district court recognized, plaintiffs began experiencing substantial attendance declines at their places of worship immediately after DHS announced the policy change with a reported press release explaining that the prior sensitive locations policy tied the hands of ICE and CBP officers, whereas the new unrestricted policy would empower them to go after undocumented immigrants at places of worship. Plaintiffs submitted dozens of declarations from pastors and rabbis attesting to their attendance declines and attributing them to fear among congregants and ministry participants that ICE and CBP would engage in enforcement activity at their places of worship under the new policy. The district court nonetheless held that plaintiffs' attendance declines were insufficient to establish plaintiffs' standing without more substantial evidence that the policy change, rather than defendants' broader immigration crackdown, caused the absences and that the attendance would rebound if the sensitive locations policy was reinstated. This holding reflects numerous legal errors. First, both this and the Supreme Court have consistently rejected any threshold of magnitude for Article III injuries. If the plaintiff fuel producers and Diamond Alternative Energy lost just $1 of revenue due to the challenge regulation they had standing to bring their claim, and as we note in our reply brief, the United States Solicitor General agrees that Diamond stands for the proposition that standing does not depend on the extent of the injury in First Amendment challenges. Ms. Merkin, can I ask you, I'm trying to understand how plaintiffs' claims and their injuries and their remedies, you know, the remedies that you are seeking line up. So it seems that the so there are two, I think, primary remedies being sought. One is a broader injunction against enforcement at churches, except in exigent circumstances and with a judicial warrant. And the other is some kind of reinstatement of the Mayorkas enforcement guidance. So as to the broader relief, you know, an injunction that would remedy First Amendment and RFRA harms, is the attendance declines, are the declines in attendance also an injury that goes to that relief? Because the district court only talked about attendance declines with respect to the narrower injunction about the Mayorkas memo, but did not consider attendance declines as an injury that might support the broader injunction? Yes, I think the district court was focused on the narrow restoration of the sensitive locations policy because that's the would revert us to the status quo. And we acknowledge that going beyond the status quo would be difficult. We wanted to preserve that broader injunction because we do think that once you get to the merits, that RFRA probably would require restricting the sensitive locations policy even further. So, you know, thinking... Are plaintiffs only seeking a preliminary injunction on the narrower grounds about restoring the Mayorkas memo? Or are you also seeking a preliminary injunction for the broader relief? Because that, I think, is potentially important to the standing question. Yeah, we proposed both in our proposed order. I think we focused primarily on the restoration of the sensitive locations policy, recognizing that that's the status quo, which would be the default at the preliminary injunction standard or the preliminary injunction stage. I do think, just thinking through your question on, you know, we focused also on the restoration of the sensitive locations policy because I think standing is potentially more difficult there for the reason that the district court said, which is, can we show that the restoration of the policy... So, if the attendance declines, you know, which the district court assumed were both occurring and were a Article III type of injury, then would that support the broader injunctive relief? There might be a closer tie of redressability with the broader injunction than with the narrower injunction. I see your point. So, if you have... I mean, I've looked through the hearing transcript and it's a little bit quirky, but like if plaintiffs are not pushing the broader injunction for the PI, then that's one thing. Yes, I see. I think you make a good point that perhaps traceability is more difficult for the broader injunction because that wouldn't restore us to the status quo. Both traceability and redressability. Well, I think that if the broader injunction were put into place, that would, just as a matter of predictable behavior, cause some subset of our plaintiff's congregants to be comfortable going back. So, I think redressability would be satisfied there. I will say here before this court, we have focused, I think, almost entirely on the restoration of the sensitive locations policy, recognizing that that's the most likely preliminary injunction that we're going to get. So, I'm comfortable focusing on that. And is that... Okay. So, are you just conceding the broader injunctive relief at the PI stage? Is that... I don't understand the government or the district court to have reached the question of whether we would have standing for that broader injunction. I think you're correct that the district court was focused on standing for the narrower injunction. And so, I'm comfortable. I think maybe what I'm saying is we're certainly not forfeiting that broader relief as the litigation goes forward. But you're saying you're not forfeiting it down the road on the merits, but you're not really presenting it as a... I don't think it's before this court right now because it isn't part of the decision below that we were appealing. I guess we... I think on remand, we could ask for that for the preliminary injunction again, but it wasn't really addressed below. Can you clarify what is the difference between the broader injunction and the narrow injunction that you're discussing? Yeah. So, the broader injunction would go beyond the sensitive locations policy and require the defendants to get either a judicial warrant or have exigent circumstances before conducting enforcement activity at a place of worship, whereas under the Mayorkas memo, there is headquarters approval when you have a particular set of narrow circumstances that justify the action. So, I'll go back maybe to the legal errors. I identified the first one, which is the magnitude of harm. That means that if even a small likely would have continued attending, but for DHS's change in enforcement policy for places of worship and likely would return if the sensitive locations policy was restored, plaintiffs have standing to seek preliminary injunctive relief. So, the district court erred as a matter of law when it held that plaintiffs had to show that attendance would rebound under the injunction. So, you have several theories of standing. Which in your view is the strongest or most straightforward one, which is one that you would most rely upon? Yeah, I think the attendance declines, which is why I've started on that here. The other big category is the imminent threat of enforcement. It just seems attendance decline because of CASA when you get down the road, but maybe you just work this out down the road. The court ultimately would have to parse every individual house of worship or plaintiff to see if they have standing and look at the, I guess, the facts of attendance for each of them because you can't award the injunction unless they have standing. Whereas, it seemed to me maybe more straightforward to go with imminence because that affects everybody more cleanly. Well, so I think all 27 plaintiffs, as you say, had to establish their own standing. The associational plaintiffs can do that based on one house of worship. The denominations can do an organizational injury. 26 of the 27 plaintiffs have attested to attendance declines, substantial attendance declines. So, the one that did not, we have a declaration ready to go on remand to submit to the court. So, we will be able to get relief for all or at least have standing for all the plaintiffs based on the attendance declines. And you're relying primarily on theory of large attendance declines and not just, you know, a small one. So, it is true that all of the plaintiffs have substantial attendance declines, but I think an important error in the district court's decision below was assuming that we would have to show all of those attendance declines were attributable solely to... No, I understand. I'm just talking about the magnitude of the decline. It seems like we don't have to reach whether one person not showing up would be a cognizable harm. So, you started out saying, I now judge into the $1 harm. So, the reason I think that it would be helpful for the court to reach that is because when it gets to traceability and redressability, the district court's rationale is, well, you also have this broader immigration crackdown, and there are probably people who wouldn't go back to church even if the sensitive locations policy is restored because they're so frightened of leaving their home. I was interested in that because it just seems to me if the sensitive locations policy is back and you presumptively are not enforcing or ICE is presumptively not enforcing at churches and synagogues, that becomes safer than your home. It becomes the safest place. Like, I think it's interesting to me. It just seems to me that that would definitely drive people back to these places because in a world where they can be arrested in their homes and administrative warrants and things are a thing, it just seems to me that the churches and the paths of worship are the safest places. And then on top of that, you have the importance of communal worship in the Judeo-Christian tradition. So, right now, the missing congregants are missing out on one of the most important things of their faith practice, which is being able to engage in group prayer, group worship, communion, and then the ministry participants went to the These are not the sorts of services that they would be foregoing lightly. So, I agree with you, Your Honor, that once churches and synagogues become safe places again, that they are going to be very eager to go back. Go ahead. The district court ruled that there needed to be some showing, factually, that the administration not just had rescinded this non-enforcement policy at places of worship, but that they also intended to target places of worship for enforcement. And since there was no evidence of that in the district court's view, there was no credible threat of increased enforcement at churches. Can you just explain what you believe, if anything, is wrong with that reasoning? Yes. So, that goes to the imminent threat, the second bucket of harm, and that is one of the district court's legal errors. There were two there. The district court was applying a heightened standard that this court has generally applied in the Second Amendment context. It does not apply to free enforcement challenges under the First Amendment, and that is in Seekers v. Gonzalez. So, we would ask, even if the court ends up resting on attendance declines, that it would correct that legal error. So, on remand going forward, we're not subject to that heightened test for imminence. The other error of law in that holding is that the district court was narrowly focused on the likelihood of an actual or pending immigration raid at a church or synagogue. So, we had a number of incidents of enforcement activity happening in parking lots, and the district court discounted those because the officers hadn't actually gone into the places of worship. The 2021 Mayorkas Memo applied at or near places of worship, and it didn't just apply to detentions and raids. It applied to surveillance and other activity, and this is really important for us because much of the enforcement activity that's been happening to plaintiffs is heavily armed CBP and ICE officers gathering in the plaintiff's parking lots, which is profoundly disruptive to the religious exercise that's happening inside the building, regardless of they attempt to go in. So, we would respectfully request that the court clarify that as well. If I could go back to the second legal error on the attendance declines, the district court, or I should say Diamond Alternative Energy, squarely rejected any need for the sort of the evidence that the district court was demanding, in particular statistical evidence and third-party declarations. So, in Diamond, the Supreme Court held that the plaintiff fuel producers established traceability and redressability based on their own declarations, attesting to likely third-party reactions to the challenged regulations, combined with common-sense inferences about the predictability of those reactions. Here, the district court faulted us for having declarations that were secondhand. That's now foreclosed under Diamond, and for not having objective statistical evidence, and that's also foreclosed by Diamond. And, you know, I don't want to take too much of the court's time on this, but our declarations are highly specific on this point. We cite them in our opening brief at pages 29 to 33, and the reply brief at 13 to 16. Those declarations and attestations are certainly as robust, if not more so, than what they had in Diamond over my time. Ms. Corcoran, so I think plaintiffs here have alleged, you know, serious harms to religious liberty under the First Amendment and RFRA potentially. And I think it's part of the problem, though, for the PI is that if the focus is exclusively on what type of enforcement memo the government is relying on, that seems to be a much weaker basis for redressing the religious liberty harms. Because between the Mayorkas memo and the RFRA, both policies would allow for enforcement at churches. You know, they're sort of a matter of degree, right? They don't say anything about whether such, you know, enforcement activity is, you know, restricted by the First Amendment or, you know, has to be done only in exigent circumstances under RFRA. So if the PI is based purely on enforcement discretion, how do you establish the traceability and redressability? I think that makes it, which is why I started with the other remedy, which is the broader injunction may well remedy the religious liberty harms. But this enforcement discretion, which is just a memo and a rescission of a memo, and both memos leave open lots of space for enforcement or non-enforcement, right? And there are not a lot of examples that have been presented of, you know, raids inside churches and things like that. So how does the relief you're seeking on the PI actually give you redressability and traceability? I think that is the hard, I think that is hard, despite the serious questions that have been raised. Yeah, thank you, Your Honor. And so I'll start with the profound difference of degree between the two policies, and then I'll get to the case law that applies there. Under the 2021 policy, enforcement at places of worship had to be avoided at all times, except under a narrow, there's an enumerated list of examples, all involving exigent, compelling government, not all exigent, but they're all compelling government interests and national security threat, imminent danger, things of that nature. But it was just guidance. So like there could have been more enforcement. They could just revoke the guidance or ignore the guidance. The guidance isn't binding. It doesn't create any... But the guidance was binding on the CBP and ICE officers. Right, they can just be overturned. I mean, guidance documents... Well, but it was an effect, and what we're challenging is the overturning of the policy. So I don't think there's any question. And then when you were under those narrow circumstances, you needed headquarters approval, whereas under the rescission memo, no approval is needed at all. There is a specific memo that says a local supervisor can... But under the Mayorkas memo, they could delegate approval. Yeah, there's no evidence that that happened, but... But they could. But see, the big thing, like enforcement guidance, it's this peculiar kind of thing. It's not a protection for religious liberty. It's just a self-imposed restraint on the executive branch. It's the nature of these guidance documents makes it very difficult to establish. So I would push back on that in the sense that the guidance memo is directive. It's mandatory at the CBP and ICE officers who are conducting this enforcement activity on the ground. And under the Mayorkas memo, they were limited to compelling government situations involving imperative fact patterns. And even under those, if it wasn't exigent, you had to go to headquarters. And so moving to the case law, the Supreme Court's recent decision in Sions v. Gutierrez, this court has some cases on point too, like Mountain State Legal Foundation v. Glickman. You don't have to show that the government will give you the relief you want because of the judicial relief. I didn't say that very eloquently, but essentially, in Sions, the government argued, well, the plaintiff here is seeking DNA evidence by challenging this particular state law. We're not going to give him that evidence, even if you overturn that state law. And what the Supreme Court said was that doesn't affect judicial redressability because by striking down the law that's challenged, we are requiring the government to reconsider its position. And even if they ultimately end up doing the same thing, that is at least partial judicial redressability, which satisfies Article III. And I would say that that proposition applies here. Is the only difference between the old policy and the current policy that it's the delegation or is it also a different criteria that can be used currently to have enforcement at places of worship and that those criteria are lesser or lower bar, so to speak, than before? Yes, I think the difference in criteria is the most important distinction between the policies. I said just a minute ago what the criteria in the 2021 policy were. Now there are no criteria at all. The officers have unfettered discretion to use their common sense. So as an example, right now, a CBP officer could say, you know what, that church parking lot over there seems like a great place to set up because I know there are a lot of removable immigrants inside and we'll get them when they come out. Common sense, that's very efficient. That obviously wouldn't have been allowed under the 2021 policy because it wouldn't have fit within the types of circumstances in which enforcement activity was allowed. And then again, you would have had to have gotten headquarters approval. So that is a big enough difference. I'm sorry, I thought that they couldn't do that unless they got approval from their ASAC or ASOD. So I said CBP just now. CBP is not subjected. I use CBP as my example for that reason. For ICE, if an ICE officer were to make that same decision, they would go to their local supervisor. I don't remember the exact acronyms. The ones you just gave were probably correct. I realized it was different like that. So CBP, it's just at the discretion of any officer and ICE with the approval of some, there are hundreds of these supervisors. Right. And even for ICE, it was verbal or written. So you could just call up the local supervisor and say, can I go set up in the parking lot down the street? And he could say fine. So Plagia's position just to be clear was that for the purposes of the PI, just restoration of the Mayorkas memo would be sufficient. We certainly have standing for that because it would at least partially redress our injuries. While the broader litigation proceeds. Yes. All right. Thank you. We'll give you some time on rebuttal. Thank you. Mr. Tallent. Good morning, your honors. May it please the court. Michael Tallent representing the federal appellees in this case. On January 20th, 2025, DHS authorized federal immigration officials to use their discretion and common sense to decide whether to enforce federal immigration law at sensitive locations to include churches. Plaintiffs are 27 religious associations representing 38,000, a little over 38,000 different congregations and almost 10 million congregants scattered across the country. They claim that this policy will, if there is an ICE raid or an immigration enforcement action at their church, will cause them harm by trenching on their religious rights. Before they filed their suit two weeks after the Huffman memorandum was and they filed their PI motion roughly a month later. In total, and as a district court discussed in its opinion, they have provided the court one example of an enforcement action on this record to support their claim. I'm sorry, those declarations were filed in February of 2025. A month after the issuance of the Huffman memorandum. Right. So when you say only one example, that was one example within, I guess, two weeks of the policy going into effect. A month after the policy going into effect. Okay. It just seems like... Well, we've been litigating this now for a year. They filed their appellant's brief in September. They only added two more examples. So I think we are dealing with maybe three examples. We're supposed to be finding facts here anyway. They could have added a hundred more declarations to their brief. And I would think that your position would be, you know, that's not part of the district court record of review, not a first view. So I don't understand what the point of your argument is. So the point of my argument is that they claim these enforcement actions are imminent. They claim that they are right targets for enforcement for any number of reasons. They have immigrant populations at a number of these congregations. These churches are located in areas where there is enforcement activity going on. They claim it is imminent. They have 38,000 of these congregations where enforcement actions could occur. In a month, they only pointed to one example. But for purposes of the legal analysis, it's not the number. It's just like, has it ever happened before, right? It just can't be chimerical. And if there's been one within the last month and within a month of this happening, just for the legal analysis purposes, that means that there's been past enforcement and it's not chimerical. Well, no. What the Supreme Court said in Murphy, and it's well-established, is past enforcement is only relevant for purposes of establishing future enforcement. And I think the point is, if you have... So the government hasn't disavowed that they're going to enforce under this policy? Like, why have the policy if they're not going to use the policy? Well, again, even if we don't need to disavow in order to... Well, that's in the case law. That's just... Well, that is... ...imminence. So disavowal appears in the kind of pre-enforcement Susan B. Anthony type of context. That's not this context. When you have an enforcement discretion, the government has the ability to engage in enforcement at its own discretion. The courts never look to whether there's a disavowal to establish imminent standing. What the court has looked to, what this court looked to in United Presbyterian Church, is whether there is evidence that the plaintiffs are going to be targeted for enforcement. So the complaint... But I guess going back to, okay, if we're supposed to be using our common sense here, what is the purpose of revoking the old policy that said there would be generally a very high bar for any enforcement at places of worship? What's the purpose of revoking that policy unless you intend to ramp up enforcement at places of worship? I mean, why bother? Well, I don't have in the record kind of the purpose. I would say that the Mayorkas Memo applied to more places than just places of worship. So I don't think you can draw a straight line from the rescission of the Mayorkas Memorandum to enforcement at places of worship. Okay, but places of worship was one of them. Places... Even if the purpose was to allow, you know, to not tie the hands of immigration enforcement officials is what I think plaintiffs like to point to in the record. The fact in the record and what Judge Friedrich looked at in their declarations is that we have a situation where, yeah, maybe in theory this could allow enforcement at worship services, but it just hasn't manifested. It didn't manifest in the one month between the... Isn't the standard whether it's more likely? I mean, that's what the standard was in Diamond Alternative Energy, right? Well, it hasn't. So even if it's likely, I don't think you can say if there's 38,000 opportunities for enforcement to happen in a place of worship, and plaintiffs can only point to one in a month where they claim there's been an immigration blitz. And I would point the court to paragraphs five and six of the complaint, where they point out there's been in the week after the Huffman Memorandum came out and the administration announced its more aggressive enforcement policies, there were 4,500 arrests, 1,000 on a Sunday, but only one occurred. One. Then why doesn't the plaintiff associated with that one have standing? Because they still need to show that there's going to be an imminent enforcement action at that church in the future. And there's nothing that they have provided in the record, and there's nothing that they've tried to bring in outside the record to this court to illustrate that. So what should a plaintiff, what type of evidence is a plaintiff supposed to have to have standing? Well, the standard when we're dealing with a question of future enforcement discretion. So when they're not being directly regulated by the criminal statute, as would be the case, for example, in Susan B. Anthony List and that line of cases, they need to show that enforcement is imminent, that they're being targeted. That's a standard in United Presbyterian Church. That's a standard in Clapper. Again, I think you can just look at the numbers, and that's what Judge Friedrich did below. When you have a significant, when their position is they are right targets for enforcement action by DHS operatives, and that this administration is aggressively enforcing immigration law. The natural tendency of this, and I think this is actually their imminent argument, is, well, we're going to have ICE raids or CBP raids at our churches at any moment. The fact that it hasn't happened undermines their claim that enforcement at these houses of worship is imminent in any, I think, kind of logical sense of the term. It seems to be a little bit of an interesting argument for the government to say, we're enforcing everywhere. We're ramping up enforcement everywhere. We are going to kind of remove a barrier to enforcing at places of worship. But the court should presume that by doing so, even though we're enforcing everywhere, we're not going to enforce at places of worship, where we just remove the barrier to enforcing. Make that make sense. Well, I think the reason it makes sense is anytime, so even if there is a policy allowing the government to engage in certain action, if there's a question about whether the action will occur, then you haven't, then the plaintiff hasn't established imminence. I think the cleanest, like neatest sentence appears in then Judge Scalia's opinion in United Presbyterian Church, where he says it is not the law that a church is standing to challenge a statute that authorizes the government to get a warrant and then search the church property to seek a felon. Cases like Clapper, cases like United Presbyterian Church, cases like Laird v. Tatum, cases like Lyons v. City of Los Angeles, when the basic gist of the plaintiff's claim or injury is, if this happens, if the government exercises its discretion in a certain way in the future, I will be harmed. They have to show more than just the possibility of harm. An objective, reasonable probability was a standard the court rejected in Clapper. So because of what Judge Rao was talking about, this is a guidance memorandum. This is kind of guidance to DHS officials about how they can enforce laws potentially at these sensitive locations, including more than just churches. The individual plaintiffs here have to show an imminent enforcement action at a single church. And it's black-letter law that past enforcement actions don't establish imminent future enforcement actions. They're at best helpful for predicting. Why doesn't the drop in attendance support their claims, support their claims that they are facing, you know, that the broader enforcement efforts are causing a decline in attendance, and that decline in attendance is an injury? Because as they came up here and they were very clear, they are challenging the rescission of the Mayorkas Memorandum and the Huffman Memorandum. So they can't just say because of the broader enforcement environment that's going on, our injuries are traceable to this specific policy decision by the Department of Homeland Security. So even absent this lawsuit, I mean, the government is bound by the First Amendment and by RFRA in the actions that it takes, whether that's immigration enforcement or other enforcement. So is it the government's position that there are no First Amendment or RFRA constraints on immigration enforcement at places of worship? I don't think it's the government's position that we will, we are unconstrained by the Constitution and the laws of this country in anything we do. So there would be other, I think, to your point, yes, this isn't a just go forth and ignore the Constitution, ignore the laws when you engage in enforcement actions. It is a use your discretion, use your common sense. The fact that... Act within the law. Act within the law. I think that's always kind of implied by any governmental directive. The fact that we haven't seen a slew of these enforcement actions at churches not only undermines their imminence argument. I do think it also undermines their argument that the decline in attendance is traceable to the decision to rescind the Mayorkas policy. And they expressly link them... Could you be making the same argument about the broader injunctive relief that plaintiffs are seeking, right? The broader injunctive relief being the First Amendment and RFRA require there to be exigent circumstances and possibly a judicial warrant to do this enforcement at a place of worship. Do you think the standing inquiry is the same? And I think that it would be broadly the same here because they would still need to show that they are going to be imminently targeted by DHS. And again, we're dealing with a situation where the record shows one enforcement action at Plaintiff's Church and 38,000 possible targets that they claim are ripe for ICE action. The fact that it is not happening, I think, makes this a quintessential example of an abstract concern about probable future harm and a broader issue with, I think, kind of just trying to get the courts to superintend the policy of the United States government, which the Supreme Court's been very clear is not... Article III is meant to prevent. Why isn't this case on imminence similar to Susan B. Anthony in that there is prior enforcement against one of the plaintiffs? So that was an issue one time for Susan B. Anthony, and also sort of targeting of a specific group. In Susan B. Anthony, it was certain political groups who wanted to make political speech, but this policy does target houses of worship for enforcement in a way that previously they weren't. I mean, I guess that was imprecise, but basically it increases the risk for houses of worship that there'll be enforcement in their churches of their congregants. And to me, that seems a lot like Susan B. Anthony in terms of the more precise targeting of these groups. And also there was a prior enforcement of one of the plaintiffs. So two responses to that on the legal point, the Susan B. Anthony test, in that it's in their briefs and requires them to engage in violative conduct as kind of the common language. The Huffman Memorandum... It's not exactly on all fours, but it's basically the imminence of enforcement of the conduct, whatever the conduct is. In that case, it was violative conduct. In this case, it's... But that is the doctrine test, and they cannot commit violative conduct because the Huffman Memorandum does not require or prohibit them from doing anything. If we want to step back and maybe look at it, maybe more from a broader doctrinal angle, it's a difference between being the direct object of the regulation. So being told you can or cannot do something being directly regulated, in which case traceability... So they are the direct object of the regulation. It's just not being told that you can or can't do something. But this is... It's not exactly on all fours, but it is a policy that targets enforcement in sensitive locations, churches being one of them. So in that sense, it's not like Laird v. Tatum. So it is different. Well, I would disagree because cases where the question is, is the government going to exercise its enforcement discretion in a certain way, fall within the ambit of clapper. And in fact, plaintiffs don't dispute this characterization of their... At least their attendance declines, because they say this is conditional on the actions of third parties, not before the court. So that is well outside the Susan B. Anthony case, where there's no question about, is a harm going to stem from a third party? The harm in those cases is a direct regulation of an entity or a person or a business that wants to engage in the violative conduct. So from a doctrinal answer, those cases simply have no application here. From a factual answer, I would push back a little and say the guidance memorandum, again, from a factual matter does not... It goes broader than just churches, right? It's just a rescission of a sensitive location policy that applied to numerous different entities. And on the factual record, I don't think you can say ICE is targeting or DHS is targeting churches when, you know, we have in the court plaintiffs who represent 38 plus thousand churches. Judge Wilkins said this is a policy that enables ICE and CPB to enforce at churches more than they did before. That's the whole purpose of this. And so the policy or the law at issue in Clapper authorized the federal government to intercept communications. The example that... Much more specific to enforcing in churches. And there were public statements. It was publicized and there were statements we're going to be able to enforce more now that we can go to churches. So as a fact... I mean, as a factual matter, though, whatever those statements... You can even take those statements and read them for everything plaintiff says they're worth. The fact of the matter is there hasn't been an enforcement. There hasn't been... There wasn't enforcement in a month. Go ahead. Why does the government not just carve out churches? Because of the unique First Amendment interests. I mean, the policy was about sensitive locations, including churches. Yes. So... Churches, synagogues, places of worship, different constitutional and legal concerns. I guess I missed the first part of your question. I'm sorry. Why not just explicitly... You know, if the government's policy is to not enforce in these places, which seems to be what you keep saying over and over, that we're not doing this. We don't plan to do this. Well, I do not know what the plans are for the Department of Homeland Security. We have a record that shows that an enforcement action has not been... That is to rely on the fact that there is not, in fact, such enforcement. They do not provide it in the record. Again, they say they have 38,000 churches. They say a ton of these churches are ripe for enforcement actions. They have provided one example for one plaintiff. For a certain plaintiff, if we want to talk about attendance declines, they don't even allege that there have been attendance declines on this record. This goes back to Judge Wilkins' point, which is the policy is to increase enforcement at these locations, including places of worship. And yet also there's this defense of this, which is that we're just not doing this, or the record doesn't show that the government is doing this type of enforcement. The record doesn't establish that enforcement is imminent at any one of plaintiff's churches. And that's the legal standard for establishing kind of an imminent injury, non-speculative injury for future enforcement. That was their burden to show. And again, they set themselves up to say, well, this is obviously something that's going to happen. That's why they rely, I think, a lot on these common sense kind of inferences. Are you suggesting that for a house of worship to have standing, they would have to have specific evidence that that specific house of worship is going to be targeted? That is consistent with how the court treated these types of cases in Clapper and Lyons. Would a house of worship be able to make that standard? They'd have to have inside knowledge about what ICE and CPB are planning to do today. Well, given the fact-sensitive nature of, I'll answer that, I just want caveat by saying standing is very fact-sensitive. So what would make it stronger? I'm not saying it will establish standing because it's very kind of totality of the circumstances, but things that would make it stronger is if, for example, a DHS official appeared at a church one day to arrest someone and that person wasn't there and they told the pastor, I'm going to come back until this guy shows up. I think that would make their case a lot stronger. But that's also very church-specific. They don't have that example. They simply, I mean, I think the only- Are you saying that they have to have something like that in order to have standing? I think that- Some kind of very specific knowledge that their house of worship is about to- Well, I think that would be consistent with how the court approached- So your answer is yes, that's what you think is the requirement. Again, I don't want to commit to saying they need like a particular magic word or a particular fact, but if you look at how the court approached it- Then back to Judge Wilkins' question, what do they need? If they don't need that, what do they need? Well, in Murphy v. Missouri, for example, they had, the plaintiffs came in and they had evidence that they said the White House did not like certain types of speech on social media and was pressuring the social media companies. That wasn't enough to establish standing in that context, right? In Clapper, that was still- Answer what they do need. What do they need? Well, I think I've given it. They need something that's specific, I think. Okay, so that's your answer. It has to be. It has to be specific. An ICE officer came to the church, couldn't find who they were looking for, and said, we're coming back. Again, it's a totality of circumstances. I'm not going to say they need specifically that. There could be other facts they could- Something like that. But something like that. And they don't have- Let's suppose the director says, we're rescinding this policy because we intend to go after immigrants wherever we may find them that are here illegally, including at churches. And then, you know, they issue that policy. Do they have standing then? No, Judge Williams. They would still need to show that they are being targeted. It's like that statement- The head of the agency could say, we intend to enforce at churches, and we still wouldn't meet the standard. Well, I think not for these particular plaintiffs, because standing is plaintiff specific. So they need to show that they are going to be imminently targeted by an ICE operation. The director has got to say, I'm going to enforce, we're going to enforce that, you know, ABC church or ABC denomination. And then perhaps then ABC church or ABC denomination would have standing. I certainly think that's a much stronger case, and we certainly don't have that here. But you won't even concede that gives some standing. Again, I don't know the, you know, given that standing is not mechanically applied, I'm always a little cautious to say, well, certain magic words, certain statements. I do think that's a much more difficult case. And I'll point out, they're not really- Opposing counsel came up here- What if they said we're targeting churches of- who have congregations of 500 or more megachurches? Would a megachurch have standing? I still think in that context, the megachurch- because there's so many megachurches. Even if ICE says as a-  I think, no, because at that level of generality, it is still vesting- We're targeting churches that are painted white. Again, to the- You would have to have the specific church. Well, I think if they said, tomorrow, we are going to raid all these churches that are white. But tomorrow, we're waiting megachurches. Megachurches don't have standing. You'd have to be the specific megachurch. I'm not- I don't want to commit. But I do think that's a much harder case. And again, we don't have that. I mean, it seems like under your view, even if they said that, Judge Pan's hypothetical, we're going to raid megachurches tomorrow, and one gets raided, seems like your position would be that if they came to court to challenge the policy, you would say they don't have standing because they got raided once, but they can't prove that they're going to get raided again. Well, I think that's what the Supreme Court indicated in cases like Lyons, where the person was subject to an unconstitutional seizure, and the court said, well, he can't show it's going to happen again. Again, it passed- So nobody has standing, it sounds like. Well, no way. In that context, they wouldn't have standing for injunctive relief. The Ninth Circuit case that plaintiffs cite, I think that one's Presbyterian Church. I mixed up Presbyterian Church and United Presbyterian Church from this court. But in that case, the court said that they had standing for at least a nominal damages action, right? They are seeking an injunction. So the extent to which past enforcement actions are relevant, and the Supreme Court was very clear about this, it's like super clear in Murphy, is their predictive effects for future enforcement actions. So in the megachurch example, if that happened, and the ICE director said, we're only going to hit megachurches once, we're not doing it in the future, that megachurch certainly wouldn't have standing to seek preliminary injunctive relief on a prospective basis. And so on this record, they kind of doubly fail because they don't show an imminent targeting of any of their churches. And the past enforcement actions that they put into the record involve one kind of raid on a church, and then four surveillance actions, just kind of giving them everything that I think they claim to be, everything that they want to be an enforcement action on this record. So we have like in total five, over 38,000 churches. This is, looking at Murphy, that's very weak evidence. Requirement in the case law that if you have an organization, and you have 1000 members of your organization, that if you decide to only get, you know, declarations from five of your members, that what the court should presume is that there's no evidence from the other, you know, 95% of the members. I mean, the plaintiffs in the organizational standing case don't have to pull all of their members and then present those findings to the court when they present standing, but that's what you're attempting to twist this around into. Well, I disagree that that's what I'm trying to do here. So maybe an example, in Murphy v. Missouri, the plaintiffs came to court and one of the plaintiffs had, according to the court, at least one example of a past instance of censorship that could be traced to the government defendants in that case. What the court said is that plaintiff still needs to show that enforcement is going to be imminent, right? That, I'm sorry, censorship is imminent and will occur in the future. I'm not saying that they need to provide a declaration from every church. What I am saying is that whatever this evidence in it is incredibly weak, because if we look at the past enforcement actions, we only have five examples at most. I would argue the rate is probably more probative of the surveillance examples. One is clearly speculative. The line in the declaration is, we think it's ice in an idling truck outside our church, but at best they have five examples on this record, over 38,000 churches that they say are ripe targets for enforcement actions in an administration that is aggressively enforcing it. Given that posture, I think the five examples provide weak evidence going forward. That's language from Murphy, and they certainly do not give rise to an inference that this administration is targeting churches in such a way that this court can conclude any particular church that plaintiffs represent is at risk of an imminent ice ray. And I think that's kind of the upshot of Judge Friedrich's analysis. Are you defending the application of this targeting standard from ORD in this context? Because it seems that the district court applied a case that we have applied in the context of Second Amendment cases, criminal prosecutions, and we explicitly said this doesn't apply to constitutional things, agency actions. Are you defending that ORD standard in this context? I am defending the ORD standard insofar as it is consistent with how Clapper directs courts to review. So are you saying that ORD is the proper standard to be applied in this context? I think from a very kind of... It's a yes or no question. Well, I think from a tight doctrinal standpoint, Clapper is. I think ORD is appropriate. I'm asking if you're defending the district court's citation and reliance on ORD. Yes, because I think it's consistent with Clapper. And you think ORD is the correct standard? I think Clapper is a correct standard and ORD is a correct... I can't get a yes or no answer out of you. Because I recognize that ORD does... I just have a simple question. The district court had an analysis that relied on ORD. I'm asking you, are you defending that? Do you think that's the correct standard, yes or no? It's a correct standard because it represents Clapper in this context. Do you think ORD is the correct standard, despite what we've said about ORD? Because the issue that this court has flagged with ORD, that these are criminal laws that are directly regulating people, is not implicated by this case, right? The problem, the tension that plaintiffs flag between ORD and this case, this court's kind of First Amendment reinforcement, Susan B. Anthony type of cases, is that ORD does seem to be a direct criminal regulation. But that's not implicated here. This case is not a direct regulation. So why don't you just agree that ORD is not the correct standard? That Clapper is, but ORD is not. Why can't you just say that? Because, again, I think ORD is applicable in this case because it cites the right standard for a non-direct enforcement. You just noted the reasons why it's not. I noted the reasons why it's, the reasons why it does not have no relevance to this case. Because, again, they're not being directly regulated. So they are not committing, they cannot commit the violative conduct because there is no violative conduct to commit. The cases that plaintiffs cite that they say are in tension with ORD and are inconsistent with how pre-enforcement challenges are done in the First Amendment context, do not have any application here. This case is like the First Amendment challenge in cases like Clapper, Murphy, United Presbyterian Church, which do not, which do not say that there's some lesser standard to establish kind of a pre-enforcement challenge. What they require is an imminent targeting of the plaintiffs. Right. And is showing a very strong factual showing that the threatened action is imminent. And to the extent that ORD uses that standard, perhaps maybe in the wrong context on the facts of ORD, it is used correctly in the context of this case. And that's the position we're taking. All right. All right. If you want to take, you know, 30 seconds or so to wrap up. Yeah, just real quick on the, so two quick things. We talked a lot about imminence. I think the fact that plaintiffs do not think that's their strongest statement or strongest theory of standing is indicative of the weakness of that position, especially on this record. As to the question of attendance declines and traceability, again, I think the fact that there's not an imminent risk of enforcement tends, it suggests that the district court was correct, that there's some other explanation for why individuals are not going to church. And that's a broader kind of, I think, aggressive enforcement posture of this administration. In fact, plaintiffs actually concede because they spend a lot of time trying to argue or parse out why their claim is a additional cause, as opposed to that not being kind of the broader cause. Again, it's their burden, though, to establish that it is the rescission of the Mayorkas memo that is causing the declines in worship. I think as Judge Friedrich kind of ably explained, that's just simply not borne out by this record. And if you look at the pages, if you look at the declarations, they've cited, I think, pages out of their appellate's brief and the reply brief, which references declarations they filed. A lot of them do not, they're not very clear, right? They do not expressly say that the people are not going to church because of the rescission of the memo. I think it's very telling. A lot of the statements, if you look around kind of the declaration, say since the rescission memo, people have not been going to church and there's been attendance declines. Well, the rescission memo, as the district court noted, was issued contemporaneously with this more aggressive enforcement posture. Fair enough. Further questions? Thank you. Ms. Corcoran, I think you were out of time. I'll give you three minutes on your vote. Thank you. So I'll start by saying we think the imminent threat harm is very strong as well. I was asked to pick and answer attendance declines because it's an objective present harm. On imminent threat, a number of things to say, but one thing my co-counsel has pointed out is that, Judge Rao, when I was answering your questions about the broader injunction, I meant in the context of the attendance declines. Those, I think, are attributable to the rescission of the policy. I didn't mean to abandon the broader injunction with respect to the imminent threat. Certainly, we have standing with respect to the imminent threat injuries. You are not seeking the broader injunction in this preliminary posture, is what I heard you say. We aren't. All we are seeking from this court is a ruling that we have standing to seek the preliminary injunction from the district court. A preliminary injunction about the memo. Yes, with our judicial relief being either the restoration of the memo or the broader memo or, I'm sorry, the broader relief that we sought. So I was answering. Okay, but when you were previously at the podium, you suggested that for the purposes of preliminary relief, you're only relying on seeking an injunction about the memo. We have. We have requested both. I think it's actually quite. I know you had requested both, but when you stood up, you said that you are not relying on the broader relief. I meant in the context of the attendance declines, and my co-counsel told me I was not careful about that, so I apologize. I think what we're asking from this court is just a ruling that we have standing to pursue our preliminary injunctive relief, which includes both. I think what I meant to recognize was that because the status quo is the restoration of the memo, I think that the district court naturally was focused on that, but certainly our imminent threat future injury would provide standing for either one of those sorts of injunctive relief. And then to move to the imminent threat injury, in Clapper and United Presbyterian, the plaintiffs were challenging broad surveillance policies. There was no evidence that the plaintiffs would be targeted or had even been contemplated. And in Clapper, I think there were at least five steps that had to happen before the plaintiffs would be injured, including the government deciding to rely on that particular statute instead of others. You needed to get FISA approval before the surveillance would have happened. That's very different than what we have here. And I'll just quickly identify the four categories of evidence that we have that show imminent threat. First, defendants do not dispute that ICE and CBP are under a mandate to find and deport every removable person in this country. We didn't talk about that mass deportation mandate in our declarations by accident, is an important part of this story. The declarations established that all 27 plaintiffs regularly host removable immigrants in their places of worship. So you pair those pieces of evidence. And the only question is where the defendants are ultimately going to be able to find the plaintiff's removable congregants. It's not an if, it's a when and where. And third, by DHS's own account in their public communications, the purpose and effect of rescinding the policy was to empower ICE and CBP to fulfill the deportation mandate by engaging in enforcement activity at places of worship, which they could not do under the prior policy. And fourth, defendants are, in fact, now conducting immigration enforcement operations at plaintiff's places of worship and others. There are six incidents just in the first month following the change of policy. So if you put all of those together, that amounts to a substantial risk under- It seems to me too that this is different from CHOPPER and that this policy targets sensitive locations, including the clients. There are places, I mean, it's much more specific. And that's why, to my mind, it seems more like Susan B. Anthony. But on which theories are stronger or not stronger, it seems to me that the pocketbook injury, you didn't have declarations for all of your clients to have these pocketbook injuries, but it just seems to me, and correct me if I'm wrong, it just seemed to me that that's a direct harm to your clients. It doesn't rely on what third parties are going to do, such as congregants, and it doesn't rely on third-party rights. And a pocketbook harm is something that's very familiar and accessible to everyone. And if it's imminence of enforcement and a pocketbook harm, which it seems like almost all of your, but I'm sure you could probably supplement on a remand to make sure everybody fled them if they didn't do so fully. It just seemed to me that that could potentially be a cleaner way because it doesn't harm so much with everybody's attendance and it goes with imminence, although it's just one step more than, I guess, associational harm based on imminence. But it doesn't rely on third parties. Yes. And to start where your honor started, I think you were exactly right when you said earlier that the plaintiffs are the directly regulated party here. And the reason this is a third-party conduct case is because it's how third parties are responding to the regulation of our plaintiffs. And that I think is quite different. It actually makes our case easier than Department of Commerce or Diamond Alternative. In Lujan, the court said, when you are the regulated party, we essentially assume that you have standing. And so to go to the pocketbook injuries, there's the security costs, but they're almost inextricably intertwined with the conscience injury here, which is that we have pastors and rabbis on the ground who are trying to figure out, in the exercise of their pastoral duties, how they're going to protect their places of worship. And so they are exerting costs to putting cameras and to put signs on the doors. I think what the district court said was, well, those are self-inflicted harms under Clapper. That depends on imminence. That depends. So they rise and fall together. I will say, I think that the Catholic Bishop's Brief makes a very persuasive argument that that Clapper self-inflicted injury test does not apply to conscience injuries. And I'm not aware of any precedent that would apply to that test because there is something kind of problematic about judicial second-guessing of the decisions that pastors and rabbis are making in the exercise of their pastoral duties. So I think that's just an open area of law. I can't point you in any case law one way or the other on that. And if you could, Clapper, I just was a little confused about your colloquy with Judge Rao, just like enlighten me. I just don't understand. What is the difference in standing? How does it affect the standing analysis? What the scope of the injunction? So it doesn't affect the standing analysis for the imminent threat. It potentially affects the standing analysis for the attendance declines. Because as we say, the attendance declines were in response to the rescission of the sensitive locations policy. And that's why when Judge Rao asked me about it, I backed away because I didn't want to get stuck trying to defend the traceability of the attendance declines to kind of the absence of that broader injunction. So I think it potentially matters there. I don't think this court needs to go that far because you can say the attendance declines are redressable and traceable to the rescission of the policy and at minimum give us standing for that. But in the imminent threat context, we would have standing for either one of them. And then if I could just end that, my friend said that he did not know. There's a real muddling here of the claims, which are First Amendment RFRA APA claims, the injuries and how those injuries match up with the claims, and then how all of that matches up with the two different injunctions. Yes. I wish the briefing and the district court opinion were a bit clearer on how all of this fits together. Yes, I think it is complicated. And then later on that we have 27 plaintiffs and we've put a lot before you. I just wanted to end. My friend said that he did not know the reason that the rescission happened. The DHS acting secretary explained, he said that they were rescinding the policy because they wanted to empower the brave men and women in CBP and ICE to enforce our immigration laws and catch criminal aliens who will no longer be able to hide in America's schools and churches to avoid arrest. And then he explained that they were rescinding it because it tied the hands of our brave law enforcement while the new policy would entrust them to use common sense. So I think our plaintiffs were reasonable in taking the administration at its word on that. So if there are no further questions, we ask that the court hold that the plaintiff's evidence establishes a substantial likelihood of standing under the correct legal tests and remand for further conservation of plaintiff's request for a preliminary injunction. Thank you, the matter is submitted.
judges: Wilkins; Rao; Pan